*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
June 20, 2025
10:13 AM

Plaintiff-Appellee,

v

No. 370555
Wayne Circuit Court
LC No. 18-004779-01-FC

DEMETRIUS CHAPEL,

Defendant-Appellant.

Before: MALDONADO, P.J., and M. J. KELLY and RIORDAN, JJ.

PER CURIAM.

Following a jury trial, defendant, Demetrius Chapel, was convicted of first-degree, premediated murder, MCL 750.316(1)(a), conspiracy to commit first-degree murder, MCL 750.157a and MCL 750.316(1)(a), discharge of a firearm from a vehicle causing death, MCL 750.234a(1)(d), discharge of a firearm at a building causing death, MCL 750.234b(5), two counts of assault with intent to commit murder, MCL 750.83, discharge of a firearm at an occupied building, MCL 750.234b(1), and seven counts of carrying a firearm during the commission of a felony (felony-firearm), MCL 750.227b. Chapel appealed as of right to this Court, which remanded to the trial court for an evidentiary hearing related to the search and seizure of Chapel's cellular telephone.[1] On remand, the trial court found that the evidence on Chapel's cellular telephone was seized in violation of the Fourth Amendment and so it suppressed the evidence. The court then determined that the error was harmless beyond a reasonable doubt, so it denied Chapel's motion to vacate his convictions. Chapel now appeals by delayed leave granted.[2] For the reasons stated in this opinion, we reverse and remand for a new trial.

---

[1] *People v Chapel*, unpublished per curiam opinion of the Court of Appeals, issued April 8, 2021 (Docket Nos. 348244 and 349245 (2021).

[2] *People v Chapel*, unpublished order of the Court of Appeals, entered August 29, 2024 (Docket No. 370555).

-1-

## I. BASIC FACTS

This case arises from a drive-by shooting that occurred at approximately 8:33 p.m. on November 30, 2017, on Nashville Street in Detroit, Michigan. Multiple individuals sustained gunshot wounds and one man was shot dead. Eyewitnesses were unable to identify who had fired the shots. However, based upon eyewitness accounts and video footage, the shots were fired from inside a black Buick that had both passenger side windows rolled down. Further, bullet fragments recovered from the scene reflected that at least two different guns were used in the shooting. From that information, the police determined that there were at least two shooters.

At trial, the prosecution presented evidence that, prior to the shooting, Antonio Henley and Markise Wright got into an altercation at a nearby liquor store. Henley (or Henley's brother) and Wright were associated with rival groups or gangs. According to Henley, Wright and he engaged in "griming," which he described as a look exchanged without speaking. He stated that Wright, who was irate, argued with him and displayed a pistol. Henley returned to the house on Nashville Street, and Wright drove past several times in a silver vehicle. Wright explained that he wanted to see how Henley would react.

Wright, who lived nearby to Nashville Street, then called his cousin, Emanuel Long (whose nickname was "E"), and told him that Henley was in the area and the color of the vehicle he was driving. He told Long that he wanted him to "shout" at Henley. He explained that he had "bad intentions" when he made that request. Long was at a restaurant when he received the call and video footage from the restaurant shows him leaving and getting into a black vehicle.

Stan Brue, a contractor for the Detroit Police Department, was qualified as an expert in the field of cell phone tower data mapping and forensic analysis of cell phone records. His testimony reflects that, after receiving the call from Wright, Long traveled from the restaurant toward the area where the shooting occurred. In addition, as it relates to Chapel, Brue testified that between 7:37 p.m. and 7:41 p.m. Long's cellular telephone made multiple calls to the cellular telephone associated with Chapel. Additionally, the cellular phone data suggested that Chapel's telephone was moving west, toward the scene of the shooting. Just before the shooting, Chapel's and Long's phones were utilizing towers that were in similar sectors and that were in the general area of the crime scene.

Wright went home and heard gunshots. When he looked out the window, he saw lights from police vehicles and laughed. He sent Long a picture of the scene. He also called Long. Wright testified that Long had told him that he would call him back, that he was "in the hood," and that it was "hot right now." Wright was later arrested. While he was incarcerated, he received a letter from Long, who apologized for getting Wright into "this predicament."

## II. NEW TRIAL

## A. STANDARD OF REVIEW

Chapel argues that on remand the trial court erred by determining that the admission of the suppressed cellular telephone evidence was harmless beyond a reasonable doubt. "A trial court's decision to grant a new trial is reviewed for an abuse of discretion." *People v Jones*, 236 Mich

App 396, 404; 600 NW2d 652 (1999). "An abuse of discretion occurs when the court does not select a reasonable and principled outcome." *People v Maye*, 343 Mich App 57, 65; 996 NW2d 571 (2022).

## B. ANALYSIS

Chapel's cell phone was seized during an investigation to an unrelated homicide. Law enforcement obtained a search warrant for the phone and extracted data, but did not find anything implicating him in that homicide. Later, without obtaining a new warrant, law enforcement accessed and searched the data that had been extracted. That information was then admitted at trial. As noted above, on remand, the trial court determined that the information on Chapel's phone was seized in violation of the Fourth Amendment and that it had to be suppressed as a result. The question on appeal is whether the admission of the suppressed evidence was harmless beyond a reasonable doubt. See *People v Anderson*, 446 Mich 392, 405-406; 521 NW2d 528 (1994) (holding that a non-structural constitutional error does not require reversal if "its admission was harmless beyond a reasonable doubt."). This requires the prosecution—as the beneficiary of the error—to prove beyond a reasonable doubt that "there is no reasonable possibility that the evidence complained of might have contributed to the conviction." *Id*. (quotation marks and citation omitted). The analysis requires that we examine the entire record and consider both the suppressed evidence and its use by the prosecution during arguments. See *People v Whitehead*, 238 Mich App 1, 7; 604 NW2d 737 (1999).

The suppressed evidence was the primary evidence linking Chapel to the shooting on Nashville Street. First, a police detective testified that three photographs had been extracted from Chapel's phone, including a photograph depicting Chapel and Long standing beside each other. In the photograph Chapel is holding a handgun. Another detective indicated that the gun depicted was "consistent" with one of the types of guns that was used in the shooting. This is the only evidence directly tying Chapel to a gun "consistent" with the gun used in the shooting. The prosecution relied upon the photograph to refute the defense argument that it was only assumed that the phone was Chapel's phone. Moreover, the prosecution argued that the photograph of the gun depicted a gun that was consistent with the caliber of at least one gun used in the shooting. Without the photograph, there is no evidence linking Chapel directly to a gun, nor is there any evidence that Chapel was the individual using the phone that was registered in his name. As a result, it was not cumulative to any properly admitted evidence.

Second, the phone was used to repeatedly search for news articles relating to the Nashville Street shooting. During rebuttal argument, the prosecution stressed:

> I think what I find interesting, and I'm going to try and keep it as short as I can, Mr. Chapel's phone. See all these exhibits that were admitted you get to hold them, touch them, and see them. When you get to Exhibit 90 take a look at Exhibit 90. [The defense argument is that it's] no proof my client had any involvement in anything on Nashville. Then why would Mr. Chapel Google or web search eleven times Google Shooting on Nashville five shot, one killed if he wasn't there? Eleven times. What's the interest? How close are the police getting to me? What do the police know? What are they reporting? Eleven times. Look at it. You get to see it.

Chapel's suppressed cell phone data was the only evidence indicating that Chapel searched for news articles on the crime. Thus, it was not cumulative to any properly admitted evidence.

Finally, the detective testified that she was able to use the "significant locations" setting on Chapel's phone to determine the routes that the phone had traveled on the evening of November 30, 2017. She used that data to create a timeline of the phone's travels, which showed that, between 7:45 p.m. and 8:45 p.m., the phone had traveled from Grayton Street and stopped at Nashville Street on November 30, 2017 before returning to Grayton Street. As noted above, the shooting took place at 8:33 p.m. The detective explained that the phone was in a vehicle because Google Maps had recorded the speed at which the phone was moving. The prosecution repeatedly referenced this testimony in her closing argument. She pointed out that the location access showed that he was in a vehicle. The shooting was from a vehicle. She repeatedly argued that it showed that Chapel traveled along a "direct route" from Grayton Street, where Long picked Chapel up, to Nashville Street, where Long and Chapel opened fire, injuring multiple people and murdering one man. She again referenced the information to draw a direct link between Chapel and the shooting during her rebuttal argument.

Without the suppressed evidence, the evidence linking Chapel to the shooting was significantly weaker. Based upon Brue's cell analysis, the record reflected that after Long spoke with Wright about Henley's presence on Nashville Street, Long called Chapel multiple times. Unlike the data extracted from Chapel's phone, however, the cell data from Brue did not place Chapel directly on Nashville Street. Rather, it only showed contact between him and Long, that he and Long were in the same area at one point, and that Chapel's phone moved west toward the shooting. Moreover, unlike the location evidence from Chapel's phone, which was unrefuted, Brue testified that the phone records did *not* provide the specific location of the phone. He further admitted that, in a different case, the police apprehended a suspect who had his cell phone on his person in one area but that the cellular tower data suggested that the phone was in a different area entirely. Thus, although the cell location data from the phone and from Brue was, in some respects, cumulative, the cell location data from the phone was far more specific and was relied upon significantly more during the prosecution's closing and rebuttal arguments.

In sum, the suppressed evidence was the strongest and most compelling evidence linking Chapel to his phone. It was also the strongest and most direct evidence indicating that he had traveled a direct route from Grayton Street to Nashville Street in a moving vehicle, that the vehicle stopped on Nashville Street, and that he then traveled on a direct route back to Grayton Street. Brue's cell tower analysis did not come close to this level of specificity and, by his own admission, was incapable of providing such a specific location analysis. Additionally, the suppressed evidence was the *only* evidence that Chapel had access to a gun that was consistent with at least one of the guns used in the shooting and that he had searched *eleven times* for news articles related to the shooting. And, given that the prosecution relied heavily upon the suppressed evidence in her closing and rebuttal argument, we cannot say beyond a reasonable doubt that there is no reasonable possibility that the suppressed evidence may have contributed to Chapel's convictions.

See *Anderson*, 446 Mich at 405-406.[3]  Because we cannot say that the error was harmless beyond a reasonable doubt, reversal is required.[4]

Reversed and remanded for a new trial.  We do not retain jurisdiction.

/s/ Allie Greenleaf Maldonado
/s/ Michael J. Kelly

---

[3] Although we agree with the dissent that there is sufficient, properly admitted evidence to sustain Chapel's conviction, respectfully, that is not the question before this Court.  Rather, we must determine whether admission of the suppressed evidence was harmless beyond a reasonable doubt. *Anderson*, 446 Mich at 405-406; see also *People v Whitehead*, 238 Mich App 1, 7; 604 NW2d 737 (1999) (accord).  Such an analysis requires more than a determination as to whether sufficient evidence existed to support the conviction.  Here, given that the strongest circumstantial evidence supporting Chapel's conviction was suppressed, and given that the prosecution relied heavily upon the suppressed evidence in closing and rebuttal argument, we cannot say that there is "no reasonable possibility that the evidence complained of might have contributed to the conviction." *Anderson*, 446 Mich at 405-406; *Whitehead*, 238 Mich App at 7.

[4] Given our resolution, we do not review Chapel's remaining arguments.